## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

SALLY BEHR OGDEN                :

             PLAINTIFF,      :

v.                             :

JOHN HERBERT OGDEN      :     Case No. 4:19-cv-00234

             DEFENDANT.     :

### AMENDED COMPLAINT*

### Statement of Jurisdiction and Venue

1.     Plaintiff Sally Behr Ogden is an individual who resides at 81 Willow Brook Road, Clinton Corners, NY 12514.

2.     Defendant John Herbert Ogden is an individual who resides at 187 Jimmy Blige Lane, Richmond Hill, GA 31324.

3.     The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

4.     This Court has jurisdiction based upon diversity of citizenship of the parties pursuant to 28 U.S.C. §1332(a)(1).

5.     Venue is proper in this District because the Defendant resides in this District pursuant to 28 U.S.C. §1391(b)(1).

### FIRST COUNT
### (Breach of Contract)

1-5.     Plaintiff repeats and reaffirms the allegations of Paragraphs 1 - 5 of the Complaint as if fully set forth herein.

* The Complaint is being amended to attach Exhibits B and C.

1

6.     From September 6, 1975 until October 19, 2009, the Plaintiff and Defendant were married.  For most of the marriage, the Plaintiff and Defendant resided in Greenwich, CT.

7.     The Plaintiff and the Defendant were divorced in a proceeding in the Connecticut Superior Court, Judicial District of Fairfield at Bridgeport, Dkt. No. FBT-FA-4026420-S (the "Divorce Action").

8.     On October 19, 2009, the Honorable Barry Pinders entered a judgment of divorce in the Divorce Action.

9.     On October 19, 2009, in conjunction with the Divorce Action, the Plaintiff and the Defendant entered into an agreement which is attached hereto as Exhibit A (the "Agreement").

10.     Prior to the Agreement, Defendant was the sole owner of Southland Holding, Inc. ("Southland").  Southland's sole asset was an office building located at 8052 Armstrong Road, Santa Rosa County, Florida.

11.     Pursuant to §8.1 of the Agreement, the proceeds of any sale of the Property are to be divided as follows:

(i)     Any mortgage or other debt shall be paid, after being properly documented;

(ii)     The Credit Suisse Loan for approximately $1,000,000 owed by the Husband and to which the Wife is by virtue of this agreement equally liable shall be paid;

(iii)     Real estate brokers' commission shall be paid;

(iv)     Property taxes shall be paid;

(v)     Reasonable attorney's fees and disbursements including real estate conveyance taxes incident to the sale shall be paid;

(vi)     Mutually agreed to fix-up expenses shall be reimbursed to the party paying for cost of same; and

(vii)     The balance remaining plus the cash on hand in the bank account and escrow account shall be divided between the parties fifty (50%) percent to the Husband and fifty (50%) percent to the Wife.

12.     On January 26, 2017, the Property was sold to Pensacola Stevedore Company, Inc.  The sale generated $1,380,502.67 to Southland.  See Exhibit B.

13.     In October of 2018 almost two years after the sale, Defendant informed Plaintiff of the sale and proposed a distribution set forth in Exhibit C by which he proposed to pay Plaintiff $108,712.48, but the deductions Defendant proposed in Exhibit C are not legitimate.

14.     At the time of the Agreement, the Property had no mortgage and the Credit Suisse Loan referenced in the Agreement was repaid in 2011 from equal funds of the Plaintiff and the Defendant.  Accordingly, the $947,577.71 taken by the Defendant was illegitimate.

15.     The $100,000 Southland Technology Note was forgiven years before the sale. Thus, it should not have been paid from the proceeds of the sale.

16.     The $115,000 in management fees are excessive and exceed a market rate fee by at least $17,500.

17.     Pursuant to §8.1(B) of the Agreement, the net rents from the Property were to be held in joint names between the Plaintiff's representative and the Defendant.  The rentals were to be used to pay expenses of the Property and the excess held for the benefit of both Plaintiff and Defendant.  Defendant was to provide an accounting to Plaintiff's representative of the rents and their usage each quarter.  Upon information and belief, Defendant has failed to do so.

18.     By failing to distribute the proceeds of the sale in accordance with the Agreement, Defendant has breached the Agreement.

19.     By failing to provide an accounting of the rents as required by the Agreement, Defendant has breached the Agreement.

20.     As a result of Defendant's breaches, Plaintiff has suffered damages.

## SECOND COUNT
### (Breach of Fiduciary Duty)

1-20.    Plaintiff repeats and reaffirms the allegations of Paragraphs 1 - 20 of the Complaint as if fully recited herein.

21.     Since Defendant exercised exclusive control of Southland, Defendant owed Plaintiff a fiduciary duty to act in her best interest.

22.     By charging the Property with illegitimate expenses, and excessive fees and failing to properly distribute the sale proceeds, Defendant has breached his fiduciary duty to the Plaintiff.

23.     As a result of Defendant's breach of fiduciary duty, Plaintiff has been damaged.

**WHEREFORE**, Plaintiff claims:

a.      damages;

b.      interest;

c.      costs; and

d.      such legal or equitable relief as the Court may deem appropriate.

<div align="center">

**PLAINTIFF**
**SALLY BEHR OGDEN**

</div>

By:     /s/Kathleen Horne_____
        Kathleen Horne
        (Bar No.:  367456)
        Bouhan Falligant LLP
        One West Park Avenue
        P.O. Box 2139
        Savannah, GA 31402-2139
        Tel.: 912-644-5739
        khorne@bouhan.com

        and

        Jeffrey Hellman
        Law Offices of Jeffrey Hellman, LLC
        (Juris No. 433635)
        195 Church Street, 10th Floor
        New Haven, CT 06510
        Tel.:  203-691-8762
        jeff@jeffhellmanlaw.com

# EXHIBIT A

AGREEMENT made as of the 19th day of October, 2009, by and between

J. HERBERT OGDEN (hereinafter sometimes referred to as the "Husband") and

SALLY B. OGDEN (hereinafter sometimes referred to as the "Wife"):

## W I T N E S S E T H:

WHEREAS, the parties hereto married on September 6, 1975 in Princeton, New Jersey; and

WHEREAS, there are three children issue of their marriage, namely: Sarah Oakley Ogden, Nicholas Belfield Ogden; and Elizabeth Lawrence Ogden, all such issue having reached their respective majority.

WHEREAS, irreconcilable differences have arisen between said parties as a result of which the marriage of the parties has broken down irretrievably and they desire to live separate and apart and will continue to live separate and apart; and

WHEREAS, the parties are desirous of entering into an agreement under which they may live separate and apart and under which fair and reasonable provision will be made for the settlement, adjustment and compromise of all property rights and questions; and

WHEREAS, each of the parties hereto is fully advised as to the property, estate and prospects of the other and has been fully advised by his or her attorney as to their respective rights and liabilities, each against the other, and to and upon the property and estate of the other; and

WHEREAS, the Husband has instituted an action against the Wife claiming a Dissolution of Marriage, which action is now pending in the Superior

1

F I L E D

OCT 13, 2009

SUPERIOR COURT
BRIDGEPORT

Court for the Judicial District of Fairfield at Bridgeport and bears Docket No. FBT FA 08-4026420 S.

NOW, THEREFORE, in consideration of these promises and undertakings herein contained and set forth and for other good and valuable consideration made over by each party to the other, the receipt and sufficiency of which is hereby acknowledged, it is covenanted and agreed as follows:

**ARTICLE I**
**SEPARATE WAYS**

1.1     The parties may at all times hereafter live and continue to live separate and apart.  Each shall be free from interference, authority and control, direct or indirect, by the other as fully as if he or she were single and unmarried.  Each party may reside at such place or places as he or she may select.  The parties shall not harass each other or compel or, by any legal or other proceeding for the restitution of conjugal rights or otherwise, endeavor to compel the other to cohabit or dwell with him or her.

1.2     Except as herein otherwise provided, the parties agree that they have heretofore divided their jointly owned tangible (and intangible) personal property to their mutual satisfaction.  The parties hereto agree that henceforth each of the parties shall own, have and enjoy independently of any claim or right of the other party, all items of personal property of every kind, nature and description and wherever situated which are now owned by or held by or which may hereafter belong or come to the Husband or the Wife with the full power to the Husband or the Wife to dispose of same as fully and effectually in all respects as if he or she were unmarried.

2

## ARTICLE II
### DIVISION OF PERSONAL PROPERTY

2.1    Except as herein otherwise provided, the parties agree that they shall divide their jointly owned personal property to their mutual satisfaction. All personal property in the name and/or possession of the Husband at the date hereof shall be and remain the property of the Husband. All furniture, books, bric- -a-brac, personal property of a household nature, personal effects, including and objects d'art and all tools, machinery and gardening equipment located at the storage facilities in New London, Connecticut, Stamford, Connecticut and Poughkeepsie, New York shall be equally divided between the parties within sixty (60) days from the date of dissolution of the parties' marriage. However, the items of personal property that came to the Wife from her family as a gift or inheritance shall be and become the property of the Wife. Notwithstanding any of the above, those items of personal property appearing on Schedule A hereto, shall be and become the property of the Husband and he shall take possession of these items within ninety (90) days from the date of dissolution of the parties' marriage. Except for each parties' jewelry, and excluding the items referenced above, which each party shall retain respectively, the joint personal property including furniture, art, antiques, etc. shall be equally divided. The parties shall proceed with alternate selection (within ninety days of the date of dissolution of the parties' marriage) of said items, with a coin toss determining which party has first selection and alternating thereafter until all the property has been divided.

2.2    The parties jointly own five horses that are kept in New York. The-



3

parties agree that title to said horses shall be transferred to their daughter,

Elizabeth Lawrence Ogden.

**ARTICLE III**
**DIVISION OF AUTOMOBILES/RECREATIONAL VEHICLES**

    3.1    The following vehicles/boats are titled in the Husband's name:

        a.   1962 Mercedes 200SE
        b.   1998 Plymouth Voyager
        c.   2004 Toyota Prius
        d.   2006 Jeep Grand Cherokee
        e.   2007 Audi A6 Advant
        f.    2008 BMW X5
        g.   25' Black Fin Boat- ½ interest
        h.   21' Rabalo 150hp Boat
        i.    13' Boston Whaler Boat

Within ten (10) days of the date of dissolution of the parties' marriage, the

Husband shall transfer title to the following automobiles to the Wife:

        a.   1962 Mercedes 200SE
        b.   1998 Plymouth Voyager; and
        c.   2007 Audi A6 Advant

From the date of the transfer, the Wife shall be responsible for all expenses and

costs related to said automobiles and indemnify the Husband and hold him

harmless with respect thereto. The Husband shall indemnify the Wife and hold

her harmless as to any loans/ liabilities on the vehicles and boats that he is

retaining.

**ARTICLE IV**
**COUNTRY CLUB MEMBERSHIPS**

    4.1 A. The Husband is a member of the following clubs:

        a.   Fisher's Island Club;
        b.   Fisher's Island Yacht Club;
        c.   Fisher's Island Sportsman's Club;
        d.   Hay Harbor Club

4

    e.     Round Hill Country Club; and
    f.      Nantucket Golf Club
    g.     New York City Racquet Club
    h.     Doubles Club

Within ten (10) days from the date of dissolution of the parties' marriage, the Husband shall transfer his Hay Harbor Club and Doubles Club memberships to the Wife. She shall pay the annual dues and assessments, if any, of such memberships and shall pay all other charges for the use of the Clubs and its facilities which are incurred or become due and payable hereafter and she shall indemnify the Husband and hold him harmless in connection therewith. The Husband shall retain all other memberships set forth above and he shall pay the annual dues and assessments, if any, of such memberships and shall pay all other charges for the use of the Clubs and its facilities which are incurred or become due and payable hereafter and he shall indemnify the Wife and hold her harmless with respect thereto.

B.    The Wife is a member of the Colony Club. She shall retain said membership free and clear of any claim by the Husband and she shall pay the annual dues and assessments of such membership and shall pay all other charges for use of the Club and its facilities which are incurred or become due and payable hereafter and she shall indemnify the Husband and hold him harmless with respect thereto.

**ARTICLE V**
**DIVISION OF RETIREMENT ASSETS**

5.1    The Husband agrees that the Court in the pending action shall enter a Qualified Domestic Relations Order transferring to the Wife fifty (50%)



percent of his accrued interest in the Conestoga/Westfield Capital Pension Plan, valued as of the date of the dissolution of the parties' marriage, together with investment gains and losses from the date of dissolution of the parties' marriage to the date of distribution to the Wife. This transfer shall be a tax-free transfer, provided, however, that payments made to the Wife pursuant to said Qualified Domestic Relations Order shall be taxable to the Wife as provided in the Retirement Equity Act of 1984. The Court shall retain jurisdiction to effectuate the entry of this order. To the extent permitted by the Conestoga/Westfiled Capital Pension Plan, the Qualified Domestic Relations Order shall specify that the Wife will be named as the surviving spouse of the pre-retirement death benefits payable under the Conestoga/Westfield Capital Pension Plan, with respect to that portion of the Husband's benefit which is assigned pursuant to this paragraph. In no event shall the pre-retirement death benefit payable to the Wife exceed the benefit which would have been paid to her had the Husband survived. In the event the Plan Administrator does not honor the Qualified Domestic Relations Order, the Court shall have the power to enter alternative orders to effectuate the intention herein. The parties agree that Attorney Elizabeth McMahon shall prepare the QDROs and that they shall equally be responsible for her fees.

5.2    The Husband has an interest in a Safir Individual Retirement Account. He shall cause fifty (50%) percent of his IRA to be transferred to the Wife (by appropriate rollover) within 30 days of the dissolution hearing. She shall receive one-half of each cash and non-cash holding in said account.

6

5.3    The Wife shall retain the Safir Individual Retirement Account held in her name free of any claim by the Husband.

**ARTICLE VI**
**DIVISION OF REAL PROPERTY**

6.1    The Husband and Wife are joint owners of real property located at 41 Flanagan Hill Road, Amenia, New York. The Wife shall have Fred King as her agent/proxy for decision making purposes relating to the sale of the house but not as beneficiary of any monies.   Said property shall be listed for sale at the Husband and Fred King's mutual agreement,  after consultation with a broker of the parties' choosing.    The Husband shall have authority to handle all arrangements in connection with the sale with Fred King, as agent for the Wife. He shall confer and consult with Fred King, as agent for the Wife, regarding said arrangements and they shall use their best efforts to mutually agree on the details regarding the sale of the house including when to list the house and sell the house as well as all fix up and improvement costs.  In the event the parties can not agree on any issue regarding the sale, the court shall retain jurisdiction over the sale and any issues regarding the sale..  The Husband shall instruct the listing broker to keep the Wife informed with respect to the sale.  In the event an offer is received within five (5%) percent of the listing price, which offer one of the parties wishes to accept, the offer shall be accepted by both parties.   The proceeds of the sale shall be divided as follows:

(i)    The balance on the existing first mortgage shall be paid;

(ii)    Real estate brokers' commission shall be paid;

(iii)    Property taxes shall be paid;



7

(iv)    Reasonable attorneys' fees and disbursements including real estate conveyance taxes incident to the sale shall be paid;

(v)    Mutually agreed to fix-up expenses shall be reimbursed to the party paying for cost of same;

(vi)    The balance shall be divided between the parties fifty (50%) percent to the Husband and fifty (50%) percent to the Wife.

With respect to the sale, each party shall report and be responsible for fifty percent (50%) of any gain on their tax return.  Absent court order or mutual consent in writing neither party shall cause any lien to be placed on the Amenia home.

6.2    Until the closing of the sale of the premises, the parties shall use their best efforts to rent the property to a third party.  Any rental income in excess of the monthly debt service and expenses shall be paid fifty percent (50%) to the Husband and fifty percent (50%) to the Wife.   The Husband shall confer and consult with Fred King regarding the leasing of the property and they shall use their best efforts to mutually agree on the details regarding the leasing of the house. In the event the parties can not agree on any issue regarding the lease, the court shall retain jurisdiction over this issue.

6.3    Prior to the division of assets set forth in Article VI below, and from Safir Account xxxxx6118 the parties shall deposit $250,000 (or such other amount as mutually agreeable in writing) into a separate account to be used for the deferred maintenance items, mortgage, insurance, utilities, taxes,  and maintenance expenses for the home.  The account shall be in the name of the

8

Husband and Fred King he shall provide a quarterly accounting to Fred King, on behalf of the Wife, with documentation evidencing monies coming into the account and being dispersed from the account.

6.4     The parties agree to spend up to $60,000 of the $250,000 on the deferred maintenance items of the residence from the separate account referenced above. Any home improvements or renovation expenses beyond the initial $60,000 shall be incurred only by mutual agreement of the Husband and Fred King, in writing, and shall be paid fifty percent (50%) by the Husband and fifty percent (50%) by the Wife.

6.5     Any monies remaining in the joint account at the time the house is sold shall be divided fifty (50%) percent to the Husband and fifty (50%) percent to the Wife.

6.6     Any shortfalls in terms of expenses, repairs and maintenance items related to the house shall be paid fifty percent (50%) by the Husband and paid fifty percent (50%) by the Wife.   The Husband shall provide Fred King with a calculation of expenses due from the Wife and said funds shall be deposited into the account within ten (10) days of having knowledge of said shortfall.

**ARTICLE VII**
**DIVISION OF FINANCIAL ACCOUNTS**

7.1     Within fourteen (14) days from the date of dissolution of the parties' marriage, the parties shall divide the accounts as set forth on Schedule B using the percentage split indicated for each account and/or asset on said schedule. The split of the stocks/securities shall divided be in proportion to how

9

the overall division of each account has been agreed to per schedule B and this Agreement.

7.2    The parties understand and agree that the assets held in the Credit Suisse accounts shall be maintained at Credit Suisse,to the extent necessary to collatorize the   Credit Suisse loan (which both parties are responsible for) associated with the asset set forth in Article VIII below,and only for so long as the Southland Holdings Property remains unsold and the loan is still owed. The Wife's Credit Suisse investment in account #5568 , 8988  9002 and 9010 will only function as margin collateral for the margin debt outstanding. and the Husband will indemnify her and make her whole from any claims made against her in excess of the ratio of their respective ownership in split of their accounts. The margin debt shall not be increased any further from these Credit Suisse accounts. The Wife's margin exposure will not exceed approximately 25% or whatever the actual percentage is as of the date of dissolution, of the margin debt outstanding. Any margin calls will be fulfilled in the following order, the Husband for the first approximately 75% and the Wife for the next approximately 25% (or in accordance with the actual percentages as of the date of divorce). It is the understanding of the parties that the margin account will be satisfied and paid by the sale of the Southland holdings property. .

**ARTICLE VIII**
**DIVISION OF BUSINESS INTERESTS**

8.1    A.    The Husband is the sole owner of Southland Holdings, Inc. The only assets owned by the entity is an office building in Florida at 8052

10

Armstrong Road, Santa Rosa County and a bank account.  Said property is currently occupied by a third party tenant.  Said property shall be listed for sale as soon as economically prudent as determined by the Husband and Fred King, as agent on behalf of the Wife, after consultation with a real estate broker.  The Husband and Fred King shall have sole authority to handle all arrangements in connection with the sale (i.e. sale's price, maintenance, fix up renovations, term of sale).  The proceeds of sale shall be divided as follows:

(i)     Any mortgage or other debt shall be paid, after being properly documented;

(ii)     The Credit Suisse Loan for approximately $1,000,000 owed by the Husband  and to which the Wife is by virtue of this agreement equally liable shall be paid;

(iii)     Real estate brokers' commission shall be paid;

(iv)     Property taxes shall be paid;

(v)     Reasonable attorneys' fees and disbursements including real estate conveyance taxes incident to the sale shall be paid;

(vi)     Mutually agreed to fix-up expenses shall be reimbursed to the party paying for cost of same; and

(vii)     The balance remaining plus the cash on hand in the bank account and escrow account shall be divided between the parties fifty (50%) percent  to the Husband and fifty (50%) percent to the Wife.

With respect to the sale, each party shall report and be responsible for fifty percent (50%) of any gain on their tax return.

11

B.    For so long as the building remains occupied by a tenant, any rental income in excess of the debt service, renovations, deferred maintenance items  and expenses shall be paid to the existing Southland account to go back into the business. Said account at Wachovia shall be held in joint names with Fred King and the Husband. This account shall remain the holding account for the rental income and the balance as of the date of divorce  and onward shall be used to maintain and repair the building, pay expenses for the building including but not limited to agreed upon administrative costs.  On a quarterly basis, the Husband shall provide Fred King, an agent on behalf of the Wife, with calculations of rental income received every quarter.  No transfers of assets, including but not limited to cash, shall take place for any purpose other than for normal operating costs or expenses, payment of debt and required capital expenditures, from the date of divorce until the division of the remaining assets after the sale of the property, except as provided in this agreement.

C.    Any shortfall in terms of expenses and/or renovations related to the property shall be paid fifty (50%) percent by the Husband and fifty (50%) by the Wife.  The Husband shall provide Fred King with a calculation of expenses due from the Wife and said funds shall paid by the Wife upon the date of the closing of the sale from her share of the proceeds.

8.2       The Husband owns stock in Unique Fabricating.  Within thirty (30) days from the date of dissolution of the parties' marriage, the Husband shall transfer and/or assign fifty percent (50%) of his interest in Unique Fabricating  to the Wife.  The Husband shall direct the company to

12

provide the Wife with any and all information required by her to carry on the investments in her name alone after the transfer. If the Husband is unable to transfer or assign said fifty percent (50%) interest to the Wife, the Husband shall hold said fifty percent (50%) interest for the Wife's benefit.    Following liquidation or receipt of any distribution from, the investment and/or stock from the company, and/or from any non-competition agreement,, the Husband shall cause the Wife to receive her share of the net payments or distributions, after taxes, legal fees, accounting fees and other related expenses, within 7 days of his receipt.  With each payment, the Husband shall provide to the Wife a calculation of taxes, legal fees, accounting fees and other related expenses paid and/or due.  At the same time, the Husband shall provide the Wife with copies of any documents he relied upon to perform his calculations as well as copies of checks or other documents showing receipt of monies paid to him from the company..

   8.3    The Husband has an interest in Foundation Source, a private investment.  He shall retain his interest in said entity free from any claim of the Wife and he shall indemnify her and hold her harmless thereto.

   8.4    The Husband and Wife have a combined sixty percent (60%) interest in JH Whitney Pan Asia Fund, a private investment which the Husband shall retain free of any claim from the Wife.    The parties' children are the beneficial owners of (40%) of the investment. The children shall retain their forty (40%) interest in said investment and the Husband shall continue to hold said interest for the benefit of the children. He shall cause the children to receive their

13

share of the net distributions, after payment of taxes, accounting fees and other related expenses as soon as possible upon his receipt.

8.5    The parties have a joint interest in Blount Springs, a private investment And shall retain their 50% interest in said investment if that is allowed or they will continue to hold the investment as it is now. They shall equally share any distributions and be equally responsible for any capital calls. The parties shall share any information with each other regarding the property and mutually make decisions concerning that investment.

8.6 The Husband confirms that the children will retain their interest in Heads and Threads and Goose Island and will provide proof of same..

## ARTICLE IX
## TRUST ACCOUNTS

9.1    The Wife is the beneficiary of three trusts: Trust Under Will for Sarah P. Oakley; Helen Mathey Inter Vivos Trust ; and the Helen Mathey Will. The principal of the trusts are held in the following accounts:

(i)    Trust Under Will for Sarah P. Oakley – U.S. Trust Account (7013);

(ii)    Helen Mathey Will - Bank of New York Mellon Account (1200);

(iii)    Helen Mathey Inter Vivos Trust - Bank of New York Mellon Account (0200).

As beneficiary of the trusts, the Wife is entitled to receive trust income generated by all three (3) accounts. She shall retain her interest in said income and accounts free of any claim by the Husband and she shall hold him harmless and indemnify him with respect thereto.



14

## ARTICLE X
### WIFE'S PENDING LAWSUITS

10.1.  A.      The Wife is currently involved in four lawsuits not related to this dissolution action, two cases in which she is the Plaintiff and the two in which she is the Defendant. She shall be responsible for advancing any and all costs and fees related to said lawsuit(s). The Wife shall have the sole authority to withdraw, prosecute or settle said lawsuit(s). The Husband shall fully cooperate in connection with any reasonable requests from the Wife in connection with said lawsuit(s). The Wife shall retain the balance of any award resulting from said lawsuit(s). Any judgment entered against the Wife relating to said lawsuits shall be her sole responsibility. She hereby indemnifies the Husband and holds him harmless with respect to any judgments claims for professional fess and any other liability in connection with these lawsuits.

B.      The Wife has a judgment against Andrea Ulanoff in the amount of $100,000. The Wife shall retain any amount she receives pursuant to said judgment.  The Wife has a pending action in bankruptcy court to determine whether or not this judgment is dischargeable.

## ARTICLE XI
### ALIMONY

11.1  The parties hereto acknowledge and confirm that their own personal incomes, estates, prospects for the future and the provisions of this Agreement, to the extent that each may benefit hereby, are and shall be sufficient to satisfy his or her needs in the present and future. Each party agrees

15

to release the other from all obligations of support and maintenance and each agrees not to make application to any court for any property division or distribution or for alimony, counsel fees or maintenance or support for himself or herself, except as otherwise set forth in this Agreement. No award of support, maintenance or alimony shall be made in favor of either party now or at any future time. Any such award of support, maintenance or alimony is hereby precluded.

**ARTICLE XII**
**MEDICAL BENEFITS AND EXPENSES**

12.1   The Wife is presently insured under certain medical policies made available to the Husband and his family as an incident to his employment. The Husband shall take all steps necessary to assist the Wife in the continuation of this insurance by transferring her coverage from group policies to individual policies to the extent permitted by law or the policy, and he will cooperate in order for her to avail herself to any COBRA benefits to the extent possible. The Wife shall be responsible for the cost of said insurance after the date of said transfer.

**ARTICLE XIII**
**LIFE INSURANCE**

13.1   Neither party shall be obligated to maintain life insurance for the benefit of the other.

**ARTICLE XIV**
**LEGAL COUNSEL**

16

14.1   The parties hereto declare and acknowledge that each has had independent legal advice of his or her own selection.   The Wife has been represented by Nancy Aldrich, Esq. of Aldrich & Aldrich, 152 Kings Highway North, Westport, Connecticut, and the Husband has been represented by Frederic J. Siegel, Esq.  and Freda K. Roberts, Esq. of Siegel, Reilly, Conlon, LLC, 1281 East Main Street, Stamford, Connecticut.

14.2   From the assets to be divided pursuant to this agreement, the Husband and Wife shall be required to pay the fees and disbursements of their respective counsel incurred in connection with the negotiation and preparation of this Agreement and in connection with the legal action now pending between the parties which are incurred up to and including the entry of a decree of dissolution without any contributions from the other.  Each party shall similarly be required to pay their own expert fees.

14.3   In the event that it shall be determined by a court of competent jurisdiction that either party shall have breached any of the provisions of this Agreement or of any court decree incorporating by reference or otherwise this Agreement or portions hereof, the offending party shall pay to the other party reasonable attorneys' fees, court costs and other expenses incurred in the enforcement of the provisions of this Agreement and/or judgment or decree incorporating any or all of the provisions hereof.

17

**ARTICLE XV**
**TAXES**

15.1 The Husband shall be entitled to the available deductions attributable to the mortgage interest and real property taxes for the residence located at 41 Flanagan Hill Road, New York for 2008 fifty percent (50%), 2009 fifty (50%) percent and thereafter 50% until sold. The Husband shall also be entitled to fifty percent (50%) of all other deductions and overpayment associated with the 2008 tax returns. The parties shall exchange their 2008 tax returns within 7 days of filing.

15.2 The parties' represent to each other that he/she has heretofore duly paid all income taxes, municipal, state, federal and foreign, on all joint returns heretofore filed by the parties; that no interest or penalties are due and owing with respect thereto; that no tax deficiency proceeding is pending or threatened thereon; and that no audit thereof is pending. If there is any deficiency assessment, claim, liability, or litigation in connection with any of the aforesaid joint returns filed by the parties or as to any tax issue related to the Husband's businesses, the party so advised by the Internal Revenue Service or taxing authority shall notify the other party promptly in writing. With respect to any such joint return or liability relating to the joint returns, the Husband and the Wife agree to equally pay any taxes, assessments, penalties, interest, and professional fees equally.

18

**ARTICLE XVI**
**DEBTS OF THE PARTIES**

16.1   Subject to the provisions of this Agreement, the Wife covenants and represents that she has not heretofore incurred or contracted, nor will she at any time in the future incur or contract, any debt, charge or liability whatsoever for which the Husband, his legal representatives, or his property or estate is now or may become liable and the Wife further covenants at all times to keep the Husband free, harmless and indemnified of and from any and all debts, charges and liabilities heretofore or hereafter contracted by her.  If the Wife does incur a debt which the Husband pays and is legally required to pay, he may deduct the amount of said debt from the monies he is obligated to pay the Wife under this Agreement.

16.2   Subject to the provisions of this Agreement, the Husband covenants and represents that he has not heretofore incurred or contracted, nor will he at any time in the future incur or contract, any debt, charge or liability whatsoever for which the Wife her legal representatives, or her property or estate is now or may become liable and the Husband further covenants at all times to keep the Wife free, harmless and indemnified of and from any and all debts, charges and liabilities heretofore or hereafter contracted by him.  If the Husband does incur a debt which the Wife pays and is legally required to pay, she shall upon demand, be reimbursed in full by the Husband.

16.3   The parties shall no longer be joint credit card holders (primary or secondary ) and the Husband shall remove his name from her Chase card #0635.

19

**ARTICLE XVII**
**REPRESENTATIONS**

17.1   The financial affidavit of the Husband dated 10/13/09____, and the financial affidavit of the Wife dated _10/19/09____ are hereby incorporated and made a part of this agreement, it being expressly understood that the terms of this Agreement and the financial arrangements hereunder were made upon the representations contained in said affidavits. It is further understood and agreed that the parties hereto relied upon said representations in executing this Agreement.

17.2   Each of the parties represents and warrants that his or her financial affidavit, the Husband's dated as of _10/13/____, 2009__ and the Wife's dated as of 10/19/____, 2009__, are true and accurate.   The terms and financial arrangements set forth in this Agreement were made based upon the representations made in said affidavits and both parties relied upon the facts set forth therein.  Each party expressly represents that there has been no substantial change in circumstances to him or to her since the date of said affidavits and that said affidavits fully, fairly and accurately sets forth the existing assets, liabilities, and incomes of the parties.  In the event of a material omission or misstatement by either party in his or her affidavit, the other party shall have the right to rescind this Agreement and reopen and reform any judgment entered in the pending action incorporating the terms hereof.

**ARTICLE XVIII**
**MUTUAL RELEASES**

20

18.1   Subject to the provisions of this Agreement, each party has remised, released and forever discharged and by these presents does for himself or herself and his or her heirs, legal representatives, executors, administrators and assigns remise, release and forever discharge the other of and from all cause or causes of action, claims, rights or demands whatsoever in law or in equity, which either of the parties hereto ever had or now has against the other, except any or all cause or causes of action for dissolution of marriage or legal separation.

18.2   Subject to the provisions of this Agreement, each party has remised, released and forever discharged and by these presents does for himself or herself and his or her heirs, legal representatives, executors, administrators and assigns remise, release and forever discharge the other of and from all cause or causes of action, claims, rights or demands whatsoever, in law or in equity, including any interest in any pension, profit-sharing, deferred compensation or other qualified benefit plan whether said interest arises by contract or pursuant to the Retirement Equity Act of 1984 or otherwise which either of the parties hereto ever had or now has against the other, except any or all cause or causes of action for dissolution of marriage or legal separation.

18.3   Subject to the provisions of this Agreement, each of the parties may in any way dispose of his or her property of whatsoever nature, real or personal, and the parties hereto, each for himself and herself, respectively, and for their respective heirs, legal representatives, executors, administrators, and assigns hereby waives any right of election which he or she may have or hereafter



21

acquire regarding the estate of the other, or to take against any Last Will and Testament of the other, whether heretofore or hereafter executed, as may now or hereafter be provided for in any law of the State of Connecticut or any other state or territory of the United States, or any foreign country and renounces and releases all interest, right or claims of right of dower, or otherwise, that he or she now has or might otherwise have against the other, on the property of whatsoever nature, real or personal, of the other, under or by virtue of the laws of any state or country, and each will at the request of the other, or his or her legal representatives, executors, administrators and assigns, execute, acknowledge and deliver any and all deeds, releases or any other instruments necessary to bar, release or extinguish such interests, rights and claims, or which may be needful for the proper carrying into effect of any of the provisions of this Agreement. Each of the parties renounces and relinquishes any and all claims and rights that he or she may have or may hereafter acquire to act as administrator of the other party's estate, although either party may name the other as executor or executrix if he or she so desires.

18.4   Except as expressly provided herein, both parties hereby expressly waive any and all rights which he or she may have in any pension, profit sharing, deferred compensation 401(k) or other employee benefit of the other whether qualified or non-qualified for federal tax purposes and whether said interest arises by contract, pursuant to said plan or by the Retirement Equity Act of 1984 or otherwise. Each party shall immediately upon demand execute any and all documents necessary to effectuate said ownership or release said interest.

22

**ARTICLE XIX**
**SITUS**

19.1 It is understood and agreed that this Agreement is entered into under the laws of the State of Connecticut, and the execution hereof wherever and whenever undertaken shall be deemed to be completed upon the delivery of the Agreement in Connecticut. The laws of the State of Connecticut shall be applied to any construction of this Agreement, and in the resolution of any dispute arising hereunder.

**ARTICLE XX**
**MISCELLANEOUS PROVISIONS**

20.1 The parties agree that all deposition transcripts, expert reports, and appraisal reports shall be kept confidential and may not be released to any person or entity without agreement of both parties hereto.

20.2 It is understood and agreed that either party pursuing legal action regarding this marriage shall fully disclose this Agreement to the court before which such action is taken. The parties hereto agree that this Agreement may be incorporated in full by reference or otherwise in divorce or dissolution of marriage proceedings and/or a decree of absolute divorce or dissolution of marriage by a court of competent jurisdiction, in the discretion of the court. This Agreement shall not merge with any decree of any court affecting the parties hereto, but shall survive any such decree and remain in full force and effect.

20.3 If a judgment incorporating the terms of this Agreement is modified, this Agreement shall be deemed to be modified accordingly.

23

20.4   In the event a judgment shall be modified as provided for in this Agreement neither party shall seek to interpose any of the terms of this Agreement which shall differ from the judgment as modified.

20.5   No modification or waiver of any of the terms of this Agreement shall be valid unless the same shall be in writing and executed by both parties with the same formality as this Agreement.  No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

20.6   The Husband and Wife have incorporated in this Agreement their entire understanding and no oral statement or prior written matter extrinsic to this Agreement shall have any force or effect and the said parties are not relying upon any representations other than those expressly set forth herein.

20.7   The obligations of the parties to make further payments shall terminate with the death of the Husband or Wife, except that any obligations outstanding at the time of death shall be an become a charge upon the estate of that party.

20.8   The Husband and Wife agree that they will at all times and at any time, from time to time, make, execute and deliver, free of cost and expenses, all further instruments and documents in writing, reasonably necessary or desirable to carry into effect the provisions of this Agreement.

20.9   This Agreement shall be executed in one or more counterparts, each of which so executed shall be deemed an original and shall constitute one and the same Agreement.

24

20.10 The paragraph headings herein are for convenience only and shall not be construed to limit or in any way affect any provision of this Agreement.

**ARTICLE XXI**
**ADDITIONAL DISCOVERY**

21.1 The parties have been advised by their respective attorneys of their right to compel discovery and inspection of the business and personal financial books and records of the other party and of their right to have accountants, appraisers and others investigate, appraise and evaluate any or all of the personal and business assets of the other. Each party has specifically waived the further exercise of these rights and has instructed his or her respective attorneys not to take any further measures, themselves or through others, with respect to the discovery, inspection, investigation, appraisal or evaluation of the personal and/or business property and assets of the other. The decision on the part of the parties not to exercise further rights of disclosure are based upon the acknowledgment by each party that he or she is satisfied with the disclosure as presently made of the financial circumstances of the other party, including, but not limited to, income potential, marital and separate property of the other and all other aspects of the present and prospective financial circumstances of the other party.

25

IN WITNESS WHEREOF, the parties hereto have hereunto set their respective

hands and seals the day and year first above written.

Signed and Sealed in the
Presence of:

_____          _____
                                     JOHN H. OGDEN

_____

_____          _____
                                     SALLY B. OGDEN

26

STATE OF CONNECTICUT )
                      ) SS.
COUNTY OF FAIRFIELD  )

On this 18th day of October, 2009 before me came John H. Ogden to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that he executed the same.

_J. Herbert_

Commissioner of the Superior Court
Notary Public


STATE OF CONNECTICUT )
                      ) SS.
COUNTY OF FAIRFIELD  )

On this 8 day of 10, 2009 before me came Sally B. Ogden to me known to be the individual described in and who executed the foregoing instrument, and acknowledged that she executed the same.

Commissioner of the Superior Court
Notary Public

27

## SCHEDULE A

The Husband shall retain the following assets:

A.   Venetian Mirror;
B.   Bedroom Chest;
C.   E. Boyd Smith Painting;
D.   Wood Rabbit Sculpture;
E.   Model Airplane
F.   And all property items that are currently in the Husband's home.

The Husband shall execute a Will which provides for the fact that the Husband will leave all of the above referenced property, together with the property he receives pursuant to Article II of the Agreement, to the children of the parties.

The Wife will execute a Will which provides that the property she has at the time of death that came from her family shall go to the children of the parties.

The Wife shall retain the following assets:

1)   4 David Fertigs,
2)   the Susan Rand paintings,
3)   the pair of paintings of trees,
4)   the two small ship prints with green frames that came from the house in East Hampton.
5)   The flower chandelier from the dining room that my parents gave me for my birthday in East Hampton.
6)   The yellow dinner plates
7)   the 8 pink flower plates that my dad gave me after my mother died.
8)   The yellow painted small armoire from the bedroom
9)   contents of the shelves in the living room and
10)  Lacey's painting that I had framed and hung over the mantle.
11)  And all property items that are currently in the Wife's home.

*For purposes of division of these assets the parties shall exchange a list of items in their respective homes, and neither will have access to the other's homes*

*SH✓*

Schedule B

Case 4:19-cv-00234-WTM-CLR   Document 1   Filed 09/16/19   Page 34 of 34

## Ogden v. Ogden
### Asset List

| Asset | Title | Value | Sally | Denny | | |
|---|---|---|---|---|---|---|
| Wachovia Account (1730) | J | $15,770 | | $8,385 | 50% | 50% |
| Wachovia Account (1656) | J | $67,770 | $33,885 | $33,885 | 50% | 50% |
| Wachovia Account (8235) | H | $2,547 | | $1,273 | 50% | 50% |
| Wachovia Account (6979) | W | $0 | | | 50% | 50% |
| Safir Investments (6118) | H | $1,222,309 | $611,154 | $611,155 | 50% | 50% |
| Credit Suisse (6092 - Conestoga) | H | $74,707 | | $74,707 | 50% | 50% |
| Credit Suisse (5568) | J | $450,828 | $50,000 | $400,828 | 11% | 89% |
| Credit Suisse (7097 - Horizon Asset Mgmt) | J | $656,155 | $328,078 | $328,077 | 50% | 50% |
| Credit Suisse (8988 - Lateef) | H | $973,214 | $340,624 | $632,590 | 35% | 65% |
| Credit Suisse (9002 - Schafer Cullen) | H | $409,966 | $204,983 | $204,983 | 50% | 50% |
| Credit Suisse (9010 - Wentworth Hauser) | H | $413,237 | $100,000 | $313,237 | 24% | 76% |
| Rockefeller & Co. (R1675)/JP Morgan (8002) | W | $1,955,000 | $1,955,000 | | 100% | 0% |
| Rockefeller & Co. (R1675/2/1) | W | $1,300 | $1,300 | | 100% | 0% |
| Safir Investments IRA (8862) | H | $105,984 | $52,992 | $52,992 | 50% | 50% |
| Safir Investments IRA (6563) | W | $20,015 | $20,015 | | 100% | 0% |
| Conestoga Pension Plan | H | $1,592,651 | $795,326 | $796,325 | 50% | 50% |
| JH Whitney Pan Asia Fund | J | $352,228 | | $352,228 | 0% | 100% |
| Horizon Multi-Strategy Fund | J | $175,565 | $87,782 | $87,783 | 50% | 50% |
| Westfield Capital | H | $0 | | | 50% | 50% |
| Blount Springs | J | $0 | | 0 | | ROG? |
| Foundation Source | W | $0 | | | | |
| Heads and Threads | H | $0 | | | | |
| Goose Island | Kids | | | | | |
| Unique Fabricating | Kids | | | | | |
| 2008 Tax Overpayment | J | $364,177 | $182,089 | $182,088 | 50% | 50% |
| Nantucket Golf Club Membership | H | $260,000 | | $260,000 | 0% | 100% |
| Round Hill Club | H | $2,800 | | | | |
| Fisher's Island Sportsman's Club | H | $0 | | | | |
| Fisher's Island Club | H | $0 | | | | |
| Fisher's Island Yacht Club | H | $0 | | | | |
| Hay Harbor Club | W | $0 | | | | |
| NY Raquet Club | H | | | | | |
| Colony Club | W | | | | | |
| Doubles Club | W | | | | | |
| Receivable from Andrea Ulanoff | W | | | | | |
| TOTAL | | $9,117,222 | $4,773,887 | $4,340,537 | 52% | 48%  $ 433,350 |

**EXHIBIT B**

| A. | U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. | TYPE OF LOAN |
|---|---|---|---|

**Beggs & Lane, RLLP**
501 Commendencia Street
Pensacola, Florida 32502
850-432-2451   fax: 850-469-3331

1. ☐ FHA   2. ☐ FMHA   3. ☒ CONV. UNINS.
4. ☐ VA   5. ☐ CONV. INS.

6. File Number: 9303-71807   7. Loan Number:

8. Mortgage Ins. Case No.:

*C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked (poc) were paid outside the closing. They are shown here for informational purposes and are not included in the totals.*

| | |
|---|---|
| D. Borrower: | Pensacola Stevedore Company, Inc. |
| | P. O. Box 12781 |
| | Pensacola, Florida 32591 |
| E. Seller: | Southland Holding, Inc., d/b/a Southland Holding, Inc. Delaware |
| | 3 John Street |
| | Greenwich, Connecticut 06831 |
| F. Lender: | Whitney Bank dba Hancock Bank |
| | 101 W. Garden Street |
| | Pensacola, Florida 32502 |
| | 8052 Armstrong Street |
| G. Property: | Milton, Santa Rosa County, Florida |
| | Santa Rosa County, Florida |
| H. Settlement Agent: | Beggs & Lane, RLLP |
| Place of Settlement: | 501 Commendencia Street, Pensacola, Florida 32502  Escambia County |
| I. Settlement Date: | January 26, 2017 |

| J. | Summary of Borrower's Transaction | | K. | Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| **100.** | **Gross Amount Due From Borrower:** | | **400.** | **Gross Amount Due To Seller:** | |
| 101. | Contract Sales Price | 1,500,000.00 | 401. | Contract Sales Price | 1,500,000.00 |
| 102. | Personal Property | | 402. | Personal Property | |
| 103. | Settlement Charges to Borrower (line 1400) | 24,446.55 | 403. | | |
| | **Adjustments for Items Paid by Seller in Advance:** | | | **Adjustments for Items Paid by Seller in Advance:** | |
| 106. | City / Town Taxes | | 406. | City / Town Taxes | |
| 107. | County / Parish Taxes | | 407. | County / Parish Taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | Pro-rata January Rent due to Seller Jan 1, 2017 thru Jan 25, 2017 | 10,584.68 | 409. | Pro-rata January Rent due to Seller Jan 1, 2017 thru Jan 25, 2017 | 10,584.68 |
| **120.** | **Gross Amount Due from Borrower:** | **1,535,031.23** | **420.** | **Gross Amount Due to Seller:** | **1,510,584.68** |
| **200.** | **Amounts Paid by or in Behalf of Borrower:** | | **500.** | **Reductions in Amount Due to Seller:** | |
| 201. | Deposit / Earnest Money | 10,000.00 | 501. | Excess Deposit (see instructions) | 10,000.00 |
| 202. | Principal Amount of New Loan | 1,275,000.00 | 502. | Settlement Charges to Seller (Line 1400) | 119,126.07 |
| 203. | Existing Loan(s) | | 503. | Existing Loan(s) | |
| 204. | | | 504. | Payoff of First Mortgage | |
| 205. | | | 505. | Payoff of Second Mortgage | |
| 206. | | | 506. | Purchase Money Mortgage | |
| | **Adjustments for Items Unpaid by Seller:** | | | **Adjustments for Items Unpaid by Seller:** | |
| 210. | City / Town Taxes | | 510. | City / Town Taxes | |
| 211. | County / Parish Taxes Jan 1, 2017 thru Jan 25, 2017 | 814.91 | 511. | County / Parish Taxes Jan 1, 2017 thru Jan 25, 2017 | 814.91 |
| 212. | E. Milton Fire District Assessment Jan 1, 2017 thru Jan 25, 2017 | 141.03 | 512. | E. Milton Fire District Assessment Jan 1, 2017 thru Jan 25, 2017 | 141.03 |
| 213. | | | 513. | | |
| **220.** | **Total Paid by / for Borrower:** | **1,285,955.94** | **520.** | **Total Reductions in Amount Due Seller:** | **130,082.01** |
| **300.** | **Cash at Settlement from / to Borrower:** | | **600.** | **Cash at Settlement to / from Seller:** | |
| 301. | Gross Amount due from Borrower (line 120) | 1,535,031.23 | 601. | Gross Amount due to Seller (line 420) | 1,510,584.68 |
| 302. | Less Amount Paid by/for Borrower (line 220) | 1,285,955.94 | 602. | Less Reductions Amount due Seller (line 520) | 130,082.01 |
| **303.** | **Cash From Borrower:** | **$249,075.29** | **603.** | **Cash To Seller:** | **$1,380,502.67** |

Borrower Initials: _____   Michael L. Pate

Seller Initials: ⟨signature⟩   J. Herbert Ogden, Jr.

HUD-1 May 2007
January 26, 2017 2:28 PM



Settlement Date: January 26, 2017                                                                                    File Number: 9303-71807

| L. | Settlement Charges | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| 700. | Total Sales / Broker's Commission: | | |
| | Based on Price $1,500,000.00 @ 6.00% = $90,000.00 | | |
| | Division of Commission as follows | | |
| 701. | 90,000.00 to Neal & Company, LLC | | |
| 702. | | | |
| 703. | Commission Paid at Settlement | | 90,000.00 |
| 800. | Items Payable In Connection with Loan: | | |
| 801. | Loan Origination Fee to Whitney Bank dba Hancock Bank | 5,000.00 | |
| 802. | Loan Discount | | |
| 803. | Appraisal Fee to Whitney Bank dba Hancock Bank | 2,918.00 | |
| 804. | Credit Report | | |
| 805. | Lender's Inspection Fee | | |
| 806. | Mortgage Insurance Application Fee | | |
| 807. | Assumption Fee | | |
| 808. | Lien Search Fee to Whitney Bank dba Hancock Bank | 22.05 | |
| 809. | Doc Prep Fee to Whitney Bank dba Hancock Bank | 400.00 | |
| 810. | Appraisal Management Fee to Whitney Bank dba Hancock Bank | 400.00 | |
| 811. | Environmental Fee to Whitney Bank dba Hancock Bank | 1,700.00 | |
| 812. | Flood Certification to Whitney Bank dba Hancock Bank | 5.25 | |
| 900. | Items Required by Lender to be Paid in Advance: | | |
| 901. | Daily interest charge from Jan 26, 2017 | | |
| 902. | Mortgage Insurance Premium | | |
| 903. | Hazard Insurance Premium | | |
| 904. | Flood Insurance Premium | | |
| 1000. | Reserves Deposited with Lender: | | |
| 1001. | Hazard Insurance | | |
| 1002. | Mortgage Insurance | | |
| 1003. | City Property Taxes | | |
| 1004. | County Property Taxes | | |
| 1005. | Annual Assessments | | |
| 1100. | Title Charges: | | |
| 1101. | Settlement or Closing Fee to Beggs & Lane, RLLP | 237.50 | 237.50 |
| 1102. | Abstract or Title Search to Chicago Title Insurance Company | 25.00 | 25.00 |
| 1103. | Title Examination | | |
| 1104. | Title Insurance Binder | | |
| 1105. | Document Preparation | | |
| 1106. | Notary Fees | | |
| 1107. | Attorney Fees to Shumaker, Loop & Kendrick, LLP (includes above item numbers: | | 1,425.00 |
| 1108. | Title Insurance to Beggs & Lane, RLLP (includes above item numbers: | 3,187.50 | 3,162.50 |
| 1109. | Lender's Coverage          1,275,000.00 | | |
| 1110. | Owner's Coverage          1,500,000.00 | | |
| 1111. | Endorsement 8.1 to Chicago Title Insurance Company | 100.00 | |
| 1112. | Endorsement 9.1 to Chicago Title Insurance Company | 635.00 | |
| 1113. | Endorsement Survey to Chicago Title Insurance Company | 100.00 | |
| 1200. | Government Recording and Transfer Charges: | | |
| 1201. | Recording Fees:    Deed    27.00    Mortgage    129.00    Releases    0.00 | 156.00 | |
| 1202. | City/County Tax/Stamps:    Deed    0.00    Mortgage    0.00 | | |
| 1203. | State Tax/Stamps:    Deed    10,500.00    Mortgage    4,462.50 | 4,462.50 | 10,500.00 |
| 1204. | Intangible Tax to Santa Rosa County Clerk of the Circuit Court | 2,550.00 | |
| 1205. | Assignment of Rents & Leases to Santa Rosa County Clerk of the Circuit Court | 44.00 | |
| 1206. | Affidavit re Termination of Lease to Santa Rosa County Clerk of the Circuit Court | | 18.50 |
| 1300. | Additional Settlement Charges: | | |
| 1301. | Survey to 360 Surveying Services | 2,495.00 | |
| 1302. | Pest Inspection | | |
| 1303. | Certificate of Good Standing - Seller to Parasec | | 80.00 |
| 1304. | Certificate of Good Standing - Borrower to Beggs & Lane, RLLP | 8.75 | |
| 1305. | 2016 Real Estate Taxes to Santa Rosa County Tax Collector | | 13,677.57 |
| 1400. | Total Settlement Charges (Enter on line 103, Section J and line 502, Section K) | $24,446.55 | $119,126.07 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a copy of HUD-1 Settlement Statement.

Pensacola Stevedore Company, Inc.                                             Southland Holding, Inc., d/b/a Southland Holding, Inc.
                                                                               Delaware
Borrower: _____                Seller: _____
          Michael L. Pate, President                             J. Herbert Quong, Jr., President

I have reviewed the Closing Disclosure, the settlement statement, the lender's closing instructions and any and all other forms relative to the escrow funds, including any disclosure of the Florida title insurance premiums being paid, and I agree to disburse the escrow funds in accordance with the terms of this transaction and Florida law.

Settlement Agent: _____                              Date:   January 26, 2017
                  William H. Mitchem

WARNING:  It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 May 2007
January 24, 2017 3:26 PM

# EXHIBIT C

**SOUTHLAND HOLDINGS SALE PROCEEDS**

| | | | |
|---|---|---|---|
| Sale Building Net | A | $ 1,380,502.67 | The attached sheet gives you the details of the sale |
| | | | |
| Mortgage Repayment | B | $ (947,577.71) | attached note showing repayment amount as of Oct 2007 when I paid the county of Santa Rosa |
| Management Fees | D | $ (115,500.00) | accrued Management fees Aug 2011 thru Jan 2017  supporting memo attached showing concurrence |
| Total Expenses | | $ (1,063,077.71) | |
| | | | |
| Net Sale Proceeds | | $ 317,424.96 | |
| | | | |
| 50/50 Split | | $ 158,712.48 | |
| | | | |
| If you choose to split the note below | | | |
| Southland Technologies Note | C | $ (100,000.00) | payment due former parent company paid by me at sale of Parent co—Note attached |
| Net Sale Proceeds | | $ 217,424.96 | |
| | | | |
| 50/50 Split with STI  Note | | $ 108,712.48 | |

| A. | U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. | TYPE OF LOAN |
|---|---|---|---|

**Beggs & Lane, RLLP**
501 Commendencia Street
Pensacola, Florida 32502
850-432-2451 fax: 850-469-3331

| | | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FMHA | 3. ☒ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. File Number: 9303-71807   7. Loan Number:
8. Mortgage Ins. Case No.:

*C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked (poc) were paid outside the closing. They are shown here for informational purposes and are not included in the totals.*

| D. Borrower: | Pensacola Stevedore Company, Inc.<br>P. O. Box 12781<br>Pensacola, Florida 32591 |
|---|---|
| E. Seller: | Southland Holding, Inc., d/b/a Southland Holding, Inc. Delaware<br>3 John Street<br>Greenwich, Connecticut  06831 |
| F. Lender: | Whitney Bank dba Hancock Bank<br>101 W. Garden Street<br>Pensacola, Florida  32502 |
| G. Property: | 8052 Armstrong Street<br>Milton, Santa Rosa County, Florida<br>Santa Rosa County, Florida |
| H. Settlement Agent: | Beggs & Lane, RLLP |
| Place of Settlement: | 501 Commendencia Street, Pensacola, Florida  32502   Escambia County |
| I. Settlement Date: | January 26, 2017 |

| J. | Summary of Borrower's Transaction | | K. | Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| **100.** | **Gross Amount Due From Borrower:** | | **400.** | **Gross Amount Due To Seller:** | |
| 101. | Contract Sales Price | 1,500,000.00 | 401. | Contract Sales Price | 1,500,000.00 |
| 102. | Personal Property | | 402. | Personal Property | |
| 103. | Settlement Charges to Borrower (line 1400) | 24,446.55 | 403. | | |
| | **Adjustments for Items Paid by Seller in Advance:** | | | **Adjustments for Items Paid by Seller in Advance:** | |
| 106. | City / Town Taxes | | 406. | City / Town Taxes | |
| 107. | County / Parish Taxes | | 407. | County / Parish Taxes | |
| 108. | Assessments | | 408. | Assessments | |
| 109. | Pro-rata January Rent due to Seller Jan 1, 2017 thru Jan 25, 2017 | 10,584.68 | 409. | Pro-rata January Rent due to Seller Jan 1, 2017 thru Jan 25, 2017 | 10,584.68 |
| **120.** | **Gross Amount Due from Borrower:** | 1,535,031.23 | **420.** | **Gross Amount Due to Seller:** | 1,510,584.68 |
| | | | | | |
| **200.** | **Amounts Paid by or in Behalf of Borrower:** | | **500.** | **Reductions in Amount Due to Seller:** | |
| 201. | Deposit / Earnest Money | 10,000.00 | 501. | Excess Deposit (see instructions) | 10,000.00 |
| 202. | Principal Amount of New Loan | 1,275,000.00 | 502. | Settlement Charges to Seller (Line 1400) | 119,126.07 |
| 203. | Existing Loan(s) | | 503. | Existing Loan(s) | |
| 204. | | | 504. | Payoff of First Mortgage | |
| 205. | | | 505. | Payoff of Second Mortgage | |
| 206. | | | 506. | Purchase Money Mortgage | |
| | **Adjustments for Items Unpaid by Seller:** | | | **Adjustments for Items Unpaid by Seller:** | |
| 210. | City / Town Taxes | | 510. | City / Town Taxes | |
| 211. | County / Parish Taxes Jan 1, 2017 thru Jan 25, 2017 | 814.91 | 511. | County / Parish Taxes Jan 1, 2017 thru Jan 25, 2017 | 814.91 |
| 212. | E. Milton Fire District Assessment Jan 1, 2017 thru Jan 25, 2017 | 141.03 | 512. | E. Milton Fire District Assessment Jan 1, 2017 thru Jan 25, 2017 | 141.03 |
| 213. | | | 513. | | |
| **220.** | **Total Paid by / for Borrower:** | 1,285,955.94 | **520.** | **Total Reductions in Amount Due Seller:** | 130,082.01 |
| | | | | | |
| **300.** | **Cash at Settlement from / to Borrower:** | | **600.** | **Cash at Settlement to / from Seller:** | |
| 301. | Gross Amount due from Borrower (line 120) | 1,535,031.23 | 601. | Gross Amount due to Seller (line 420) | 1,510,584.68 |
| 302. | Less Amount Paid by/for Borrower (line 220) | 1,285,955.94 | 602. | Less Reductions Amount due Seller (line 520) | 130,082.01 |
| | | | | | |
| **303.** | **Cash From Borrower:** | **$249,075.29** | **603.** | **Cash To Seller:** | **$1,380,502.67** |

Borrower Initials: _____  Michael L. Pate

Seller Initials: _____  J. Herbert Ogden, Jr.

HUD-1 May 2007
January 24, 2017 2:25 PM



Settlement Date: January 26, 2017

File Number: 9303-71807

| L. | Settlement Charges | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|---|
| **700.** | **Total Sales / Broker's Commission:** | | |
| | Based on Price $1,500,000.00 @ 6.00% = $90,000.00 | | |
| | Division of Commission as follows | | |
| 701. | 90,000.00 to Neal & Company, LLC | | |
| 702. | | | |
| 703. | Commission Paid at Settlement | | 90,000.00 |
| **800.** | **Items Payable In Connection with Loan:** | | |
| 801. | Loan Origination Fee to Whitney Bank dba Hancock Bank | 5,000.00 | |
| 802. | Loan Discount | | |
| 803. | Appraisal Fee to Whitney Bank dba Hancock Bank | 2,918.00 | |
| 804. | Credit Report | | |
| 805. | Lender's Inspection Fee | | |
| 806. | Mortgage Insurance Application Fee | | |
| 807. | Assumption Fee | | |
| 808. | Lien Search Fee to Whitney Bank dba Hancock Bank | 22.05 | |
| 809. | Doc Prep Fee to Whitney Bank dba Hancock Bank | 400.00 | |
| 810. | Appraisal Management Fee to Whitney Bank dba Hancock Bank | 400.00 | |
| 811. | Environmental Fee to Whitney Bank dba Hancock Bank | 1,700.00 | |
| 812. | Flood Certification to Whitney Bank dba Hancock Bank | 5.25 | |
| **900.** | **Items Required by Lender to be Paid in Advance:** | | |
| 901. | Daily interest charge from Jan 26, 2017 | | |
| 902. | Mortgage Insurance Premium | | |
| 903. | Hazard Insurance Premium | | |
| 904. | Flood Insurance Premium | | |
| **1000.** | **Reserves Deposited with Lender:** | | |
| 1001. | Hazard Insurance | | |
| 1002. | Mortgage Insurance | | |
| 1003. | City Property Taxes | | |
| 1004. | County Property Taxes | | |
| 1005. | Annual Assessments | | |
| **1100.** | **Title Charges:** | | |
| 1101. | Settlement or Closing Fee to Beggs & Lane, RLLP | 237.50 | 237.50 |
| 1102. | Abstract or Title Search to Chicago Title Insurance Company | 25.00 | 25.00 |
| 1103. | Title Examination | | |
| 1104. | Title Insurance Binder | | |
| 1105. | Document Preparation | | |
| 1106. | Notary Fees | | |
| 1107. | Attorney Fees to Shumaker, Loop & Kendrick, LLP (includes above item numbers: | | 1,425.00 |
| 1108. | Title Insurance to Beggs & Lane, RLLP (includes above item numbers: | 3,187.50 | 3,162.50 |
| 1109. | Lender's Coverage        1,275,000.00 | | |
| 1110. | Owner's Coverage        1,500,000.00 | | |
| 1111. | Endorsement 8.1 to Chicago Title Insurance Company | 100.00 | |
| 1112. | Endorsement 9.1 to Chicago Title Insurance Company | 635.00 | |
| 1113. | Endorsement Survey to Chicago Title Insurance Company | 100.00 | |
| **1200.** | **Government Recording and Transfer Charges:** | | |
| 1201. | Recording Fees:      Deed    27.00    Mortgage    129.00    Releases    0.00 | 156.00 | |
| 1202. | City/County Tax/Stamps:      Deed    0.00    Mortgage    0.00 | | |
| 1203. | State Tax/Stamps:      Deed    10,500.00    Mortgage    4,462.50 | 4,462.50 | 10,500.00 |
| 1204. | Intangible Tax to Santa Rosa County Clerk of the Circuit Court | 2,550.00 | |
| 1205. | Assignment of Rents & Leases to Santa Rosa County Clerk of the Circuit Court | 44.00 | |
| 1206. | Affidavit re Termination of Lease to Santa Rosa County Clerk of the Circuit Court | | 18.50 |
| **1300.** | **Additional Settlement Charges:** | | |
| 1301. | Survey to 360 Surveying Services | 2,495.00 | |
| 1302. | Pest Inspection | | |
| 1303. | Certificate of Good Standing - Seller to Parasec | | 80.00 |
| 1304. | Certificate of Good Standing - Borrower to Beggs & Lane, RLLP | 8.75 | |
| 1305. | 2016 Real Estate Taxes to Santa Rosa County Tax Collector | | 13,677.57 |
| **1400.** | **Total Settlement Charges (Enter on line 103, Section J and line 502, Section K)** | **$24,446.55** | **$119,126.07** |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

Pensacola Stevedore Company, Inc.

Borrower: _____
Michael L. Pate, President

Southland Holding, Inc., d/b/a Southland Holding, Inc.
Delaware

Seller: _____
J. Herbert Quick, Jr., President

I have reviewed the Closing Disclosure, the settlement statement, the lender's closing instructions and any and all other forms relative to the escrow funds, including any disclosure of the Florida title insurance premiums being paid, and I agree to disburse the escrow funds in accordance with the terms of this transaction and Florida law.

Settlement Agent: _____
William H. Mitchem

Date:   January 26, 2017

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 May 2007
January 24, 2017 3:26 PM



**PROMISSORY NOTE**

SANTA ROSA COUNTY, a political subdivision of the State of Florida having an address at 200 Willing Street, Milton, Florida 32570 (hereinafter called "Payee"), on November 24, 1997, FOR VALUE RECEIVED, SOUTHLAND HOLDING, INC. d/b/a SOUTHLAND HOLDING, INC. DELAWARE, a Delaware corporation having an address at P.O. Box 868, Norfolk, VA 23501, after date, the undersigned (and if more than one, each of them jointly and severally), (hereinafter called "Maker"), promise(s) to pay to the order of Payee at its office designated above (or at such other place as Payee hereinafter may designate) the principal sum of ONE MILLION EIGHTY-NINE THOUSAND NINE HUNDRED THIRTY-THREE and 00/100 DOLLARS ($1,089,933.00), together with interest thereon from date at the rate of 7%.

Principal and interest shall be payable as follows: commencing on June 1, 1998 and on the first day of each and every month thereafter through and including May 1, 2008, Maker shall make monthly payments of accrued interest and principal in the minimum amount of SEVEN THOUSAND TWO HUNDRED FIFTY-ONE DOLLARS AND THIRTY-FIVE CENTS ($7,251.35). Payments of interest and principal shall be deferred for the period commencing on the date of this Note and ending May 31, 1998 (the "Deferral Period") and added to the balloon payment described below. Interest will not accrue on the deferred interest. The payment schedule shall be based on a thirty (30) year amortization schedule. Payment will first be applied to interest accrued and due, and then to principal. In addition to the May 1, 2008 interest and principal payment, a balloon payment in the aggregate amount of NINE HUNDRED SIXTY-EIGHT THOUSAND FOUR HUNDRED NINETY-EIGHT DOLLARS AND TWENTY-NINE CENTS ($968,498.29) shall be due and payable on May 1, 2008, which balloon payment is comprised of (a) the outstanding principal amount of $935,297.79, and (b) interest in the amount of $33,200.50 deferred during the Deferral Period (which includes interest in the amount of $1,463.21 for the period November 24, 1997 through and including November 30, 1997).

Further, should it become necessary upon default (as herein defined) beyond any applicable grace, cure or notice period, to enforce collection of any unpaid balance hereunder, each of the undersigned whether Maker(s), Sureties, Endorsers, Guarantors or other obligors on this Note, agree to pay all collection and reasonable legal expenses incurred by Payee including reasonable attorney's fees, and shall include, without limitation, such fees incurred prior to institution of litigation, or in litigation, including trial and appellate review, and in arbitration, bankruptcy or other administrative or judicial proceedings.

In the event of any acceleration (whether automatic or optional) of the maturity of the aggregate indebtedness, interest at the highest rate allowed by applicable law without violating usury laws shall be computed and be required to be paid on the unpaid aggregate principal and interest accrued at the time of acceleration until the same is paid.

Each Obligor (which term shall hereafter mean and include Maker(s), Endorser, Surety, and Guarantor of this Note) and all others who may become liable for all or any part of the obligation evidenced and secured hereby, do hereby jointly and severally waive presentment, demand for payment, protest and/or dishonor, acceleration of maturity and any and all other notices or demands in connection with the delivery, acceptance, performance default or enforcement of this Note and consents to any and all delays, extensions of times, renewals releases of any party to this Note and of any available security to any Obligor or the actual owner thereof. Each Obligor, further, waives notice of the acceptance of any guaranty and expressly agrees to pay all amounts hereunder, upon demand, without requiring any action or proceeding against the principal Maker(s).

Upon the happening of any of the following events, circumstances or conditions, each of which shall constitute a "default" hereunder, all liabilities of each Maker to Payee, less the amount of any rebates required by law, shall thereupon or thereafter, at the option of Payee, be accelerated and become immediately due and payable: (a) Failure of any Obligor to pay any installment of this Note or other obligation hereon within the Cure Period (as hereinafter defined),

237028-4

COPY

or to pay within the Cure Period any other agreement with Payee or in the mortgage referred to above; (b) Any warranty, representation or statement made or furnished to Payee by or on behalf of any Obligor in connection with this Agreement or to induce Payee to make a loan to Maker proving to have been false in any material respect when made or furnished; (c) Death, dissolution, termination of existence, insolvency, business failure of the Maker, appointment of a Receiver of any part of the property or, Assignment for the Benefit of Creditors by, or the commencement of any proceeding under the Bankruptcy or Insolvency Laws by or against Maker or any Endorser, guarantor or surety for lien said Maker (said events hereinafter referred to as an "Event of Insolvency"); (d) Failure of any corporate Obligor to maintain its corporate existence in good standing; (e) Entry of any judgment or the assessment and\or filing of any tax lien against any Obligor in excess of $250,000; (f) Taking of possession of any substantial part of the property of any Obligor at the instance of any governmental authority; or (g) Assignment by any Obligor claiming any interest in the collateral or any equity in the collateral, if any, which secures this Note, without the written consent of Payee.

For all monetary defaults under this Promissory Note and/or the mortgage, Payee must, prior to taking any action as set forth in the mortgage and/or this Promissory Note, notify Maker that it is in default, and allow Maker a period of five (5) business days from the date of said notice to cure said monetary default (the "Cure Period"). If Maker fails to cure said monetary default within the Cure Period, Payee may then assert any and all rights it is entitled to assert in the case of a monetary default under the terms of the mortgage and/or this Promissory Note. For all non-monetary defaults under this Promissory Note and/or the mortgage, Payee must, prior to taking any action as set forth in the mortgage and/or this Promissory Note, notify Maker that it is in default, and allow Maker a period of thirty (30) days from the date of said notice to cure said non-monetary default (the "Non-Monetary Cure Period"). Maker shall have the right to seek an extension of the Non-Monetary Cure Period and Payee shall grant a reasonable extension thereto, so long as Maker can demonstrate to Payee that Maker is making diligent efforts and progress to cure said non-monetary default provided that Payee shall not be obligated to grant such extension if Payee's security interest in the Premises will be materially adversely affected thereby. If Maker fails to cure said non-monetary default within the Non-Monetary Cure Period or reasonable extension thereof, Payee may then assert any and all rights it is entitled to assert in the case of a non-monetary default under the terms of the mortgage and/or this Promissory Note. For all defaults that are triggered by the happening of an Event of Insolvency under the terms of this Promissory Note and/or the mortgage, Payee must allow Maker a period of sixty (60) days from the happening of such event to either rectify, vacate, stay or otherwise cure said default before Payee asserts its rights upon default hereunder.

No waiver by Payee or other holder of this Note of any default shall operate as a waiver of any other default or the same default on a future occasion. No modification that may be granted or consented to by the Payee with regard to the time of payment or with respect to any other provisions of this Note or any delay or omission on the part of Payee in enforcing the terms hereof shall operate as a waiver, or otherwise effect its right to enforce the terms hereof or avail itself of any remedy with respect thereto.

This Promissory Note may be pre-paid in whole or in part at any time without penalty or fee.

This Note may not be changed, modified or discharged, in whole or in part, and no right or remedy of the Payee hereunder or under any other agreement may be waived except by written agreement, signed by both parties, and only in the specific instance for which given. The terms and provisions of this Note shall survive the renewal, modification, or extension of this Note.

Anything in this Note to the contrary notwithstanding, it is understood and agreed by the parties that if by reason of acceleration or otherwise, interest hereunder shall exceed the maximum amount permitted by law as to the undersigned shall be credited by Payee on interest accrued or principal or both at the time of acceleration so that as to the Obligors hereunder such interest shall not exceed the maximum amount permitted by law provided that such credit will not cure any default.

This Note has been delivered in the State of Florida.  Wherever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provision of this Note.

This loan is secured by a security interest in collateral which is evidenced by a Mortgage dated November 24, 1997.

<div style="margin-left:40%">

SOUTHLAND HOLDING, INC. d/b/a
SOUTHLAND HOLDING, INC.
DELAWARE, a Delaware Corporation

By: _____
Name: Roy V. Andrews
Title:   Vice President

</div>

COPY

-3-



## PROMISSORY NOTE

$100,000

November 24, 1997

1.  FOR VALUE RECEIVED, Southland Holding, Inc., a Delaware corporation (the "Maker"), hereby promises to pay to the order of Southland Technologies, Inc. (the "Payee"), the principal amount of $100,000 on the earlier to occur of (i) May 1, 2008 and (ii) the date on which the Maker repays the $1,089,933 promissory note of the Maker, dated November 24, 1997, payable to Santa Rosa County.  The Maker shall pay interest upon the maturity of this note until paid at an annual rate equal to 7%.

2.  Payment of principal and interest hereunder shall be made on the due date specified above at the offices of the Payee, at 2601 E. Indian River Road, Chesapeake, Virginia 23325 or at such other place as the Payee may designate to the Maker in writing.

3.  If (a) the Maker shall file a petition or commence a proceeding under any bankruptcy, insolvency or similar law of any state or any subdivision thereof or any other nation, state or political entity (whether such petition or proceeding is for relief from debts or for the appointment or authorization of a receiver, trustee, liquidator, custodian or conservator of the Maker or of the whole or substantially all of its property or any other purpose), or there is filed against the Maker any such petition or commenced against the Maker any such proceeding, and any such petition or proceeding filed or commenced against the Maker remains undismissed for a period of 60 days, or if the Maker by any act consents to, approves of or expressly acquiesces in any such petition or proceeding; (b) the Maker shall seek relief under any such law; (c) the Maker shall make an assignment for the benefit of creditors; or (d) a court of competent jurisdiction shall enter an order, judgment or decree, or enter an order for relief against the Maker in any case commenced under any such law (any of the foregoing, an "Event of Default"); then, at any time hereafter during the continuance of any Event of Default the Payee may, by written notice to the Maker, declare this note to be forthwith due and payable, both as to principal and interest, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate, or other notice of any kind, all of which are hereby expressly waived, anything contained herein to the contrary notwithstanding.  The remedies provided above shall be in addition to any other remedy available to the Payee under this note or under applicable law or otherwise.

4.  This note may be prepaid in whole or in part from time to time without penalty or premium provided that any such prepayment shall first be applied against interest accrued hereunder to the date of payment.

5.  All payments by the Maker of principal and interest, and other fees, charges and costs, under this note shall be paid to the Payee in United States in the full amount determined hereunder without reduction attributable to any

withholding or other taxes imposed by the Government of the United States or any other nation, state or political entity, and, in the event of any such withholding or other taxes, the Maker shall report the amount of the payment to be made to the Payee as such greater amount necessary so that the net remaining amount actually paid by the Maker to the Payee shall be the full amount determined under the Note, and the Maker shall be responsible for any and all such withholding and taxes.

6.  This note shall be governed by and construed in accordance with the law of the state of Virginia applicable to agreements made and to be performed entirely in Virginia.  The federal and state courts located in Virginia shall have exclusive jurisdiction over all disputes arising hereunder and the parties consent to personal jurisdiction thereunder, and each party hereby waives any objection to the aforementioned courts based on inconvenient forum or other similar grounds.  Legal process against each of the parties may be served by overnight courier service (such as Federal Express or other reputable company), or by confirmed facsimile transmission followed by overnight courier (but failure to follow-up facsimile transmission with delivery by overnight courier shall in no way impair the effectiveness of the notice) at the addresses and facsimile numbers provided in the notice provision of the Agreement.

7.  This note is given to evidence the indebtedness of the Maker to the Payee with respect to the amount advanced to the Maker to pay the down payment for the purchase of real property located in Milton, Florida.

SOUTHLAND HOLDING, INC.

By: _____
Name: John Dannenhoffer
Title: President

2

**Denny Ogden**

| | |
|---|---|
| From: | Sally Ogden <sallybehr@aol.com> |
| Sent: | Thursday, July 25, 2013 1:29 PM |
| To: | Denny Ogden |
| Subject: | Re: Southland Holdings |



Denny..I don't care if you insure it, it doesn't seem to matter. I feel you can fix up the roof as I don't want to spend any money on it. You have income and I do not. Keep records and if and when it sells you can be reimbursed from the sale or the rent whichever happens first. That is the way I would like to see it handled. Let me know. Sally

Sent from my iPhone